* Parker, C. J.
By the special verdict in this case,
it appears that the plaintiff in error was exempted from ministerial taxes, according to the provisions of the Stat. 1811, c. 6, he having regularly obtained and filed with the proper officer of the town a certificate of his membership in a Baptist society in the town of Barre, and such a society being found to exist. It is true that it also appears that the society of which he was a member *295 was not incorporated; and that their minister or teacher was not settled over that society, but only engaged to preach to them one Sabbath in a month, he being, in fact, a stated minister of another society in another town. But these latter facts are immaterial, provided the statute has legal force and validity; for it expressly puts corporate and unincorporated societies upon the same footing, and makes no distinction between such as have an ordained minister specially settled over them, and such as are occasionally taught by preachers who may be ordained at large, or as ministers of othei parishes, devoting a part of their labors and services to them.
The true and only question, then, arising in this case is, whethet the statute before cited is contrary or repugnant to the principles of the constitution, and so of no binding force upon the Court. And after a careful examination of the declaration of rights prefixed to the constitution, where alone the subject is treated of, we do no: find that the legislature is restricted in the manner contended foi by the counsel for the defendants in error.
We are well aware of the great inconveniences, and the injury tc public morals and religion, and the tendency to destroy all the decency and regularity of public worship, which may result from a general application of the indulgence granted by the legislature, in that statute, to all persons who may choose to associate, and withdraw themselves from the regular and established religious societies in towns and parishes, which, being by law obliged to support public teachers, may thus have their means and power so much diminished * as to render that duty oppressive and burdensome. But our duty is to give effect to such acts of the legislature as they have the constitutional authority to make, without regarding their evil tendency or inexpediency. Subsequent legislatures may correct the proceedings of their predecessors, which may be found to have been improvident or pernicious. And if a law, however complained of, is suffered to remain unrepealed, the only legal presumption is, that it is the will of the community that such should be the law.
We proceed to show why the statute in question may be considered as constitutional; and to show that there is no decided case which in any manner contravenes the opinion which we feel ourselves bound to adopt; that the judgment of the Circuit Court of Common Pleas is erroneous, and must be reversed.
We must premise, that so much respect is due to any legislative act, solemnly passed, and admitted into the statute-book, that a court of law, which may be called upon to decide its validity, will presume it to be constitutional, until the contrary clearly appears; so that in any case of the kind substantially doubtful, the law would *296 have its force. The legislature is, in the first instance, the judge of its own constitutional powers; and it is only when manifest assumption of authority, or misapprehension of it, shall appear, that the judicial power will refuse to execute it. Whenever such a case happens, it is among the most important duties of the judicial power to declare the invalidity of an act so passed.
The act of the legislature now in question is supposed to be unconstitutional, in providing for the exemption of persons from taxation to the support of ministers, or public teachers of piety, re ligion, and morality, in the towns or parishes within which they may dwell, if they belong to a religious society of a different persuasion, whether that society be incorporated or not. In order to ascertain whether, for this cause, the act is unconstitutional, we must. examine the constitution, to * see whether there is any restriction upon the legislature in this respect.
The framers of the constitution, and the people who adopted it in" the articles of the declaration of rights, which respect religion and public worship, undoubtedly intended to secure and establish the orderly and regular preaching of the gospel in towns and parishes, and public incorporated societies; and the decent and suitable maintenance of persons of learning and piety, to be set apart as public teachers of religion and morality. This is obvious from the frequent use of the word public, as applicable to worship, and to ministers and teachers.
Another great object was, to secure and establish the most perfect and entire freedom of opinion, as to tenets of religion, and as to the choice of the mode of worship.
It was difficult to establish any fundamental rules upon the subject, and they did not attempt it; but contented themselves with declaring the public sentiment upon the subject, and enjoining upon the legislature the importance of providing, from time to time, such laws as should carry these great objects into‘effect. It was believed that the future guardians of the moral and religious character of the state, and of the rights of conscience among the people, would be at all times regardful of these important concerns, and would establish such wholesome regulations as would comport with the solemnity of the subject and the true interests of the people.
It is therefore declared, in the third article of the declaration of rights, “ That the people have a right to invest their legislature with power to authorize and require, and the legislature shall from time to time authorize and require, the several towns, parishes, precincts, and other bodies corporate and politic, and religious societies, to make suitable provision, at their own expense, for the institution of the public worship of God, and for the support and maintenance of *297 public Protestant teachers of piety, religion, and morality, in all cases where such provision shall not be made voluntarily.”
* And it is further declared in the same article, “ that the people of this commonwealth have a right to, and do, invest their legislature with authority to enjoin upon all their subjects an attendance upon the instructions of the public teachers aforesaid at stated times and seasons, if there be any on whose instructions they can conscientiously and conveniently attend.”
The right of choosing and contracting with their own teachers is, then, declared to belong to the public bodies before mentioned; that the money paid by the subject for the support of public worship shall be applied to the support of a teacher of his own denomination, if there be any one upon whom he attends ; and that there shall be no subordination or superiority of one sect or denomination over any other.
Three great objects appear to have been the influential causes of the solemn declaration of the will of the people: 1. To establish, at all events, liberty of conscience and choice of the mode of worship ; 2. To assert the right of the state, in its political capacity, to require and enforce the public worship of God ; 3. To deny the right of establishing any hierarchy, or' any power in the state itself, to require conformity to any creed or formulary of worship.
The restrictions upon the legislature are against any exercise of authority which might contravene the rights of conscience or the choice of forms of worship, and against the establishment of any national or state creed, or form of worship, to which those who conscientiously disagreed should be obliged to conform, or suffer any inconvenience from nonconformity. The mode of securing these essential points is left entirely to the legislature, and confidence was reposed in them to maintain them by equal and wholesome laws.
That part of the declaration which enjoins it upon the legislature to exact the support of religious institutions, and attendance upon public worship, is merely directory. If no law had been passed pursuant to it, there could be no penalty upon the citizen for not obeying the clear expression of the public will; nor is * there any way of coercing a legislature to carry into effect these important requisitions. So the mode, also, of executing the will of the people, in this particular, is left entirely to the legislature ; and although laws may be passed which have a contrary tendency, and which, in their consequences, may injure, instead of promoting, the public worship, yet the legislature is to judge; and even their erroneous construction of the design of the people, as expressed in the said declaration, must have legal effect *298 so far as they are not manifestly repugnant to the principles of the constitution.
This being the character of the legislative power on this all important subject, we are at a loss to conceive how it can be re strained, when it is professedly exercised for the purpose of enlarging, instead of diminishing, the rights of the citizen on the subject of religious worship. Great responsibility rests upon the legislature, and also upon the people, in delegating power to those who have almost unlimited authority. If they, with a view to secure the rights of conscience, pass laws, within the letter of the constitution, which may have a tendency injuriously to affect the regular public worship, it is not for the judiciary power to control their course.
The mischief to be dreaded is the breaking up of the parochial religious establishments, by authorizing any number of individuals to withdraw themselves, in the easy and loose way which is provided in this act. But they have the authority, and they have continually exercised it, to incorporate parts of parishes, and even individuals, as poll parishes; and by this means to diminish the resources of the religious communities from which such corporations are taken. They may incorporate five, ten, or twenty people for this purpose; and there seems to be no more constitutional difficulties in the way of vesting societies unincorporated, and the members of them, with the same privileges.
This may be an abuse of power, for which they are amenable to their constituents ; but these acts are not therefore void. It is certainly unjust to leave the standing parishes liable to penalties, if they do not * maintain a minister, and not to impose any duty of the kind upon those whom they have exempted from the common burden. But in this they merely neglect their duty; and this neglect does not affect the validity of the acts which they may choose to pass.
Besides, it is known that there is an existing provision for the relief of towns and parishes from the burden of supporting a minister, when they shall become unable to do it, provided no contract is actually in force ; for no prosecution can be maintained against a corporation for a neglect of this duty, unless a court has adjudged it to be of sufficient ability.
It has been supposed that, according to the principles stated in the case of Barnes vs. The Inhabitants of the First Parish in Falmouth, this legislative act is clearly repugnant to the constitution of the state. But no such inference can be drawn from that case The question to be settled there was, whether the minister of an unincorporated society could maintain an action against the parish, *299 for the taxes paid by one of his hearers. The action was founded altogether upon the supposed constitutional right of the minister, in behalf of his hearer ; and no legislative act had then been passed tending to vary or affect the natural and obvious meaning of the terms of the articles of the declaration of rights before cited ; it being clear by those articles that the privilege of appropriating money paid to another use than that of the town or parish into whose treasury it was paid applied only when the appropriation was to be made to the use of a teacher of a public society, and that by a public society was intended one known and incorporated. The plaintiff in that suit could not prevail.
That decision was correct; and it was probably to avoid the effect of it that the legislature passed the law in question. It nowhere appears in the learned and elaborate opinion delivered in that case, that the power of the legislature over the subject was questioned. On the contrary, the following expressions may be considered as an admission of that power. The chief * justice observed, “ that it seems a mistake to suppose that the legislature cannot grant any further relief in particular cases, which in its discretion it may consider as deserving relief.”
Such relief had been before granted to Quakers, in whose favor no exception had been made by the constitution. The same right exists with respect to Baptists, or those of any other denomination different from that which prevails in the town of which they are inhabitants; and it may be applied in favor of Congrégationalists, where they are a minority, and dissent from the established worship of the town, or Episcopalians, or any other sect, who may unite and form themselves into a separate society.
Whether it is expedient to give legislative sanction to a system so destructive to regular and orderly worship, we again say we are not to judge. We are, however, satisfied that there is nothing in the constitution which prohibits this exercise of power.
One of the objections to the effect of the exemption of the plaintiff in error is, that the society, of which he is a member, had no settled minister; but hired one only for one Sabbath in a month. But here, again, the legislature has authorized this; not having required, as essential to an exemption, that there should be any minister at all, but only a society and a committee. In the case of Kendall vs. The Inhabitants of Kingston, (4) the opinion of the court against the plaintiff’s right to recover was founded upon the constitution and the statute of 1799, c. 87, which clearly indicated *300 that the minister who sued must be the minister of the parish, or town, or incorporated religious society, and not have been ordained over the whole religious community to which he belonged.
But the statute of 1811 makes no such requisition ; expressly giving the right to the preacher on whom the party taxed shall attend, whether he be ordained at large, or over a particular society ; or whether he divide his labors among twenty different societies, or confine them entirely to one. The provision of the act is * too broad to exclude the members of any society, large enough to choose a committee, from the enjoyment of its privileges; and it does not appear that even attendants upon public worship any where is necessary to secure the exemption.

Judgment reversed.

 5 Mass. Rep. 524.